# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED GOVERNMENT SECURITY** | : | |
| **OFFICERS OF AMERICA,** | : | |
| **INTERNATIONAL UNION, et al.,** | : | **CIVIL ACTION** |
| *Plaintiffs & Counterclaim* | : | |
| *Defendants*, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **EXELON NUCLEAR SECURITY, LLC,** | : | |
| *Defendant & Counterclaim* | : | |
| *Plaintiff, and* | : | **No. 11-1928** |
| | : | |
| **EXELON GENERATION CO., LLC,** | : | |
| *Third Party Counterclaim* | : | |
| *Plaintiff*. | : | |

# **M E M O R A N D U M**

PRATTER, J.                                                                                                   JUNE 2, 2014

The United Government Security Officers of America, International Union, and its Local 17 (collectively, "the Union"), sued Exelon Nuclear Security ("ENS") to compel arbitration, pursuant to the parties' Collective Bargaining Agreement ("CBA"), of the Union's grievance, filed on behalf of armed nuclear security officer ("ANSO") and Union member William Bastone, that ENS refused to arbitrate. Twice before the Court addressed the factual and procedural issues in this case. *United Gov't Sec. Officers of Am., Int'l Union v. Exelon Nuclear Sec., LLC* (*UGSOA II*), No. 11-1928, 2013 WL 5812111 (E.D. Pa. Oct. 24, 2013); *United Gov't Sec. Officers of Am., Int'l Union v. Exelon Nuclear Sec., LLC* (*UGSOA I*), No. 11-1928, 2011 WL 5340043 (E.D. Pa. Nov. 4, 2011). Both parties now move for summary judgment—the Union to compel arbitration and ENS for judgment in its favor because either the CBA excludes this dispute from arbitration

or federal law precludes arbitration of this type of dispute (Docket Nos. 60 and 58, respectively).[1]

For the reasons explained below, the Court will grant ENS's Motion for Summary Judgment on grounds that the CBA excludes this dispute from arbitration. Consequently, it will deny the Union's Motion and find the Exelon parties' Motion based on preclusion moot.

## I.   BACKGROUND[2]

Exelon Generation Company ("ExGen"), ENS's parent corporation, for which ENS provides security services, is licensed by the United States Nuclear Regulatory Commission ("Commission," or "NRC") to operate nuclear power plants in various facilities throughout the country. Federal law regulates nuclear power generation and the material that makes it possible, *see* Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et seq.*, and, except in otherwise allowing the government to contract with private industry, *see* 42 U.S.C. § 2121, requires entities that would operate nuclear generation facilities to obtain a license from the Nuclear Regulatory Commission ("the Commission" or "NRC"), *see id.* § 2131, 2133, 2134.

Federal law and the NRC take nuclear security seriously. Congress has empowered the Commission to authorize the private security forces of its licensees to carry high-powered

---

[1] As explained earlier, for this second argument, ENS is joined by its parent company, Exelon Generation Company. *See generally* 2013 WL 5812111.

[2] The following factual summary is based on the parties' Joint Statement of Undisputed Material Facts (Docket No. 57). The parties agreed at oral argument that the summary judgment standard of review applies, and, for purposes of resolving their Motions under that standard, submitted the Joint Statement of Undisputed Facts. The Court observes that questions of arbitrability are resolved, depending on the circumstances, at either the motion to dismiss or the summary judgment stage, and that, apparently as here, the "Rule 12(b)(6) standard is inappropriate when . . . the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity . . . ." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013) (citation and internal quotation marks omitted).

firearms, including fully automatic weapons, which federal law otherwise criminalizes, for the protection of nuclear generation facilities. 42 U.S.C. § 2201a; 18 U.S.C. § 922. In addition to promulgating its own regulations for licensees and the security measures they must follow, as required by statute, *see, e.g.*, 42 U.S.C. § 2167 (information security), *id.* § 2169 (fingerprinting and background checks); *id.* § 2201(b), (i), (k) (general rulemaking authority), including what types of procedures and precautions they must apply to these armed nuclear security officers ("ANSOs"), 10 C.F.R. § 73.56(b)(1)(iii), the Commission must regularly and rigorously assess security at each licensed facility, 42 U.S.C. § 2210d(a). For instance, the Commission's evaluations must include realistic "force-on-force exercises [that], to the maximum extent possible, simulate security threats in accordance with any design basis threat applicable to a facility." *Id.* § 2210d(b).

Commission regulations require licensees to subject to an "access authorization program" "[a]ny individual to whom a licensee intends to grant unescorted access to nuclear power plant protected or vital areas," 10 C.F.R. § 73.56(b)(1)(i), as well as, explicitly, "armed security officers," *id.* § 73.56(b)(1)(iii). Such an "access authorization program must provide high assurance that [such] individuals . . . are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common defense and security, including the potential to commit radiological sabotage." *Id.* § 73.56(c). Consequently, in order to maintain access authorization, without which an individual cannot enter vital areas of the plant, the individual must "compl[y] with the licensee's . . . access authorization program policies and procedures to which he or she is subject." *Id.* § 73.56(i)(1)(iii). Finally, licensees' access authorization procedures

> shall include a procedure for the notification of individuals who are denied unescorted access, unescorted access authorization, or who are unfavorably

terminated. Additionally, procedures must include provisions for the review, at the request of the affected individual, of a denial or unfavorable termination of unescorted access or unescorted access authorization that may adversely affect employment. The procedure must contain a provision to ensure the individual is informed of the grounds for the denial or unfavorable termination and allow the individual an opportunity to provide additional relevant information and an opportunity for an objective review of the information upon which the denial or unfavorable termination of unescorted access or unescorted access authorization was based. The procedure must provide for an impartial and independent internal management review. Licensees and applicants shall not grant unescorted access or certify unescorted access authorization, or permit the individual to maintain unescorted access or unescorted access authorization during the review process.

*Id.* § 73.56(*l*).

The Union's Local 17 represents approximately 115 ANSOs who work at ExGen's Oyster Creek Nuclear Generating Station in Forked River, New Jersey. The ANSOs actually work for ENS, which is a wholly owned subsidiary of ExGen that the latter created specifically to provide security services to its plants. The CBA between Local 17 and ENS governs many aspects of the relationship between the ANSOs and ENS. *See* CBA, Compl. Ex. 1-B (Docket No. 1-5). In particular, Article 11, section 1 of the CBA states, in full:

> For the purpose of this Agreement, a grievance is defined as a difference of opinion, controversy, or dispute between the Employer and the Union, or, between the Employer and an employee regarding only the meaning, application or interpretation of the terms of this Agreement, but not involving any change or addition to such provisions **provided; however, that issues involving the decision to grant or deny unescorted access under the access authorization program required by 10 C.F.R. Part 73 shall be resolved through the access authorization program appeal procedure, not through the grievance and arbitration procedure**.

CBA art. 11, sec. 1 (bolding in original).

The parties do not dispute that "the duties of Security Officers" at Oyster Creek "require them to be armed and to work in the protected and vital areas" of the facility, Joint Statement ¶ 19, and, thus, that "[a]s a requirement of their positions with ENS, Security Officers at Oyster Creek must" have unescorted access authorization privileges to all areas of the plant, including the protected and vital areas, in order to ensure plant security," *id.* ¶ 12. Further, the parties

4

agree, consistent with the foregoing explanation of law, that this requirement is imposed by 10 C.F.R. § 73.56. Joint Statement ¶ 19.

The Grievance the Union seeks to arbitrate in this case concerns the termination of ANSO William Bastone. ENS hired Mr. Bastone as an ANSO on May 12, 2008. *Id.* ¶ 23. Pursuant to 10 C.F.R. § 73.56, ENS requires its ANSOs to pass annual medical evaluations, in preparation for which ANSOs must complete medical history questionnaires. *Id.* ¶¶ 21–22. In early 2010, ENS personnel, reviewing Mr. Bastone's answers to his previous medical history questionnaire and his statements to an Exelon nurse, determined that, when asked, he had failed to identify previously existing medical conditions. *Id.* ¶¶ 24–27.

At this point, ExGen's Access Authorization department undertook a review of Mr. Bastone's unescorted access status and, ultimately, denied his unescorted access on February 25, 2010. *Id.* ¶ 28. On March 8, 2010, Mr. Bastone wrote to the department to appeal his denial of access authorization. And that same day, Union Local 17 filed the Grievance in question in which it alleged that Mr. Bastone was "unjustly terminated without cause" in violation of "the current CBA between Exelon and Local 17 UGSOA." *Id.* ¶ 30.

ExGen's Access Authorization department denied Mr. Bastone's appeal on May 14, 2010. ENS then denied Mr. Bastone's grievance on the grounds that Mr. "Bastone does not have the access authorization necessary to maintain his position as an Armed Security Officer at a nuclear facility" and that the determination of Mr. Bastone's access status was not reviewable through arbitration. *Id.* ¶ 30. On June 4, 2010, ENS wrote Mr. Bastone that because he was "unable to obtain unescorted access per the security requirements," his "employment with Exelon will be terminated effective" that same day. *Id.* ¶ 29.

This Union now brings this action to compel arbitration pursuant to the Labor Management Relations Act, 29 U.S.C. § 185. As the Union conceded at oral argument, its Complaint is devoid of any factual allegations regarding Mr. Bastone's Grievance and instead relies entirely, by reference, on the Grievance alone, which is conclusory. The entire description in Mr. Bastone's Grievance is

> [t]hat Officer William Bastone was unjustly terminated without cause, this is a violation of his article 6, 13 and 14 rights under the current CBA between Exelon and Local 17 UGSOA. Furthermore the company has violated the NRA by displaying disparage [sic] treatment against a Union Official for protected, concerted activities.

Grievance, Joint Statement Ex. E (Docket No. 57-5).

Although the procedural history of this case has been somewhat complicated, *see generally UGSOA I*, 2011 WL 5340043; *UGSOAI I*, 2013 WL 5812111, the issue of whether the Court must compel arbitration of Local 17's Grievance on Mr. Bastone's behalf is now squarely before the Court for decision based on the parties' Joint Statement of Undisputed Material Facts, from which the foregoing summary has been drawn.[3]

## II. DISCUSSION[4]

Unless the parties clearly provide otherwise, arbitrability "is a question for judicial determination." *CardioNet, Inc. v. Cigna Health Corp.*, --- F.3d ----, No. 13-2496, 2014 WL 1778149, at *4 (3d Cir. May 6, 2014) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938,

---

[3] Because the Court will grant the Exelon parties' Motion on the grounds that Mr. Bastone's is not arbitrable under the parties' CBA, the Court need not and will not reach the Exelon parties' argument based on the applicable federal regulations (in accordance with the views of counsel for the Exelon parties as expressed at oral argument on May 15, 2014).

[4] Federal courts apply the same standard to resolve requests to compel arbitration under the Labor Management Relations Act and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq. Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857-59 & nn.6, 8 (2010); *see also, e.g., AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 646 (1986).

944 (1995)). Courts must enforce arbitration agreements to the extent that the parties in fact agreed to arbitrate the particular dispute in question, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, (1985)—because arbitration is a matter of contract, and therefore mutual intent, parties cannot be bound to arbitrate any particular dispute that they did not agree to arbitrate, *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). Thus, a court asked to compel arbitration must be "satisfied that the parties agreed to arbitrate *that dispute*" before it. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2856 (2010); *accord CardioNet*, 2014 WL 1778149, at *5.

Courts approach the question of arbitrability by asking two more: "(1) Did the parties seeking or resisting arbitration enter into a valid arbitration agreement? (2) Does the dispute between those parties fall within the language of the arbitration agreement?" *CardioNet*, 2014 WL 1778149, at *4 (quoting *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998)). The ultimate question, whether the particular dispute in question falls within that arbitration agreement's language, depends upon—at the risk of tautologizing—"(1) the breadth of the arbitration clause[] and (2) the nature of the given claim." *Id.* at *5.

Ordinary principles of contractual construction apply to the interpretation of arbitration clauses, and the contract containing the arbitration agreement must be read as a whole. *See CardioNet*, 2014 WL 1778149, at *6-7; *Rite Aid of Pa., Inc. v. United Food & Commercial Workers Union, Local 1776*, 595 F.3d 128, 131-32 (3d Cir. 2010) ("[T]he court is limited to the construction of the arbitration clause and any contractual provisions *relevant to its scope*." (emphasis added)). Although doubts as to the breadth (or "scope") of an arbitration clause are to be resolved in favor of arbitration, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983), such a presumption of arbitrability applies—much like *Chevron*

7

deference[5]—only to the extent that the clause's language is ambiguous, *CardioNet*, 2014 WL 1778149, at *5; *see also, e.g.*, *Granite Rock*, 130 S. Ct. at 2847. "Otherwise, the plain language of the contract controls," *CardioNet*, 2014 WL 1778149, at *5, because "arbitration is still a creature of contract and a court cannot call for arbitration of matters outside the scope of the arbitration clause." *Rite Aid*, 595 F.3d at 131 (quoting *United Steelworkers of Am., AFL-CIO-CLC v. Rohm & Haas Co.*, 522 F.3d 324, 332 (3d Cir. 2008)). And, further, principles of contract construction relating to ambiguity require that courts not "distort the meaning of the language or strain to find an ambiguity," *Regents of Mercersburg Coll. v. Republic Franklin Ins. Co.*, 458 F.3d 159, 172 (3d Cir. 2006) (citing *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982)); rather, courts should read contracts "to avoid ambiguities if possible," *Nationwide Mut. Ins. Co. v. Chiao*, 186 F. App'x 181, 185 (3d Cir. 2006) (quoting *St. Paul Fire & Marine Ins. Co. v. U.S. Fire Ins. Co.*, 655 F.2d 521, 525 (3d Cir. 1981)).

Of course, litigants-to-be draft arbitration clauses in different ways. Sometimes an "arbitration provision . . . is narrowly crafted," in which case "the presumption of arbitrability [is] inapposite." *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, AFL-CIO*, 982 F.2d 884, 888-89 n.5 (3d Cir. 1992). And sometimes, alternatively, other language expressly excludes certain issues or categories of grievances from an otherwise broad arbitration clause, in which cases, these precepts demand, the exclusion must be enforced under those same contract principles. *Cf. United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 584-85 (1960); *Rohm & Haas Co.*, 522 F.3d at 332; *E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 812 F.2d 91, 95 (3d Cir. 1987).[6]

---

[5] *See Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984).

[6] And if there is no such exclusion clause, or if the arbitration clause is broad (and the exclusion clause narrow), such that the presumption of arbitrability arises, the presumption "may

8

In this case, a plain reading of the CBA and its exclusion clause compels the conclusion that the termination of Mr. Bastone's employment by ENS based on ExGen's denial of access authorization is not arbitrable. The exclusion clause at issue here is broadly worded: "*issues involving* the decision to grant or deny unescorted access under the access authorization program required by 10 C.F.R. Part 73 shall be resolved through the access authorization program appeal procedure, not through the grievance and arbitration procedure." CBA art. 11, sec. 1 (emphasis added). And termination of employment where an employee has been denied access authorization certainly *involves* that denial of access authorization—in fact, the former is essentially required by the latter, as explained above, under federal law. Further, the CBA itself provides that "[a]s a condition of employment and continued employment, an employee must meet the physical, mental, training and security clearance requirements necessary for an employee's labor category," and "[a]n employee who fails to . . . maintain the above requirements . . . necessary for continued employment"—including, therefore, security clearance—"will be subject to termination under this Agreement." CBA art. 28-A, sec. 20. There is simply nothing left to arbitrate regarding the termination itself—that, at least, is the conclusion compelled by a reading of the arbitration and exclusion clauses, in conjunction with the language of the CBA as a whole.

\*   \*   \*

---

be rebutted only by 'the most forceful evidence of a purpose to exclude the claim from arbitration.'" *Rite Aid*, 595 F.3d at 131 (quoting *AT&T Techs.*, 475 U.S. at 650). Of course, the court may both construe "the arbitration clause and any contractual provisions relevant to its scope, as well as any other 'forceful evidence' suggesting that the parties intended to exclude the disputes at issue from arbitration," together. *Id.* at 131-32. Although little discussed in this Memorandum, the "forceful evidence" standard would be met here even if the Court were to find the arbitration and/or exclusion clause ambiguous.

The Union, however, argues that the question is not so simple. Because an exclusion from an otherwise broad arbitration clause must be express, or otherwise "forceful evidence" must show the parties' intent to exclude a particular dispute from arbitration, the Union contends, the CBA's exclusion clause is ambiguous. *See also supra* note 6. And, the Union contends, the Exelon parties have failed to present any such "forceful evidence" "that those ambiguous words mean every act that could lead to an access decision, and every act that occurs as a result." Union Resp. to MSJ 4 (Docket No. 62).

Further, the Union argues, ExGen makes the access decision, so the exclusion clause cannot be thought to encompass "ENS's conduct." Union Resp. to MSJ 4. What if an ANSO's termination is pretextual—what if, for example, ENS or one of its agents, as some sort of retaliation, submits false information about the employee to ExGen, which, in reliance on that false information, denies the employee access, thus providing ENS grounds to dismiss him? And what about all the other claims that Mr. Bastone raised in his Grievance *not* having to do with his access authorization denial and subsequent termination?

None of these arguments is persuasive. While the CBA's arbitration clause is broad, so too is the exclusion. Indeed, breadth is precisely what is suggested by the common meaning of the words "issues involving." In fact, the Union's contention is almost a tacit admission of the breadth of "involving," because to state that "it is incumbent upon the [Exelon parties] to present 'forceful evidence' that those ambiguous words mean every act that could lead to an access decision, and every act that occurs as a result," is, in fact, to state the outer limits of "issues involving" that very access decision, as "involving" would be understood by most native English speakers. To endorse the Union's position, the reader must read "involving" as "involved in."

10

Likewise, there is no reason to read the exclusion clause as somehow binding ExGen but not ENS. The "appeal procedure," the Union urges, can refer only to ExGen's process, because only ExGen (and not ENS) can grant or deny unescorted access. *See* 10 C.F.R. § 73.56(a)(4). And, the Union contends, because the CBA binds only ENS and the Union, grievances for termination *by ENS*, even if such termination somehow involves the employee's loss of access *by ExGen*, must be arbitrable because ExGen cannot review an employee's termination, which is caused by ENS *after* the appeal procedure. Thus, the Union suggests, even if termination allegedly because of denial of access *involves* that denial of access, the termination, which occurs subsequent to the denial of access, cannot be reviewed through the appeal procedure, given that it precedes the termination. For this reason, the Union contends, the Court should read the exclusion as including only things that can be reviewed in ExGen's appeal process.

This argument is without merit. For one, it presupposes that a termination "involving the decision to grant or deny unescorted access" must be reviewable independently from that denial of access authorization. But federal law prohibits anyone without access authorization from serving as an ANSO, and the CBA recognizes as much. Access authorization is the ANSO's *sine qua non*, *see* 10 C.F.R. § 73.56(b)(1)(iii), and, again, the CBA itself—which must be read as a whole—elsewhere notes that "[a]s a condition of employment and continued employment, an employee must meet the . . . security clearance requirements necessary for an employee's labor category," CBA art. 28-A, sec. 20; if he "fails to [do so]," he "will be subject to termination," *id.*; *see CardioNet*, 2014 WL 1778149, at *7 ("[C]ourts are required to read contract language in a way that allows all the language to be read together, reconciling conflicts in the language without rendering any of it nugatory if possible." (citation and internal quotation marks omitted)); *Rite Aid of Pa., Inc. v. United Food & Commercial Workers Union, Local 1776*, 595 F.3d 128, 131

11

(3d Cir. 2010) (("[T]he court is limited to the construction of the arbitration clause *and any contractual provisions relevant to its scope*." (emphasis added)).[7] By operation *of law **and** the parties' CBA*, in the case of denial of access authorization, denial and termination, with the latter necessarily involving the former, are indistinguishable. If an ANSO wants to challenge his termination, he must challenge—through the appeal procedure—his denial of access authorization. He cannot later say that he did not see his termination coming, as the termination follows the denial as surely as the progression of a chain reaction.

An ANSO need not necessarily have an opportunity to challenge his termination on the grounds that the termination was pretextual. On the one hand, any other reasons simply do not matter; federal law controls, as the parties' reference of that law in the CBA indicates (the arbitration and exclusion clauses note "the access authorization program required by 10 C.F.R. Part 73"). If, on the other hand, his claim is that ExGen denied his access based on false information provided by ENS, for example, the proper forum for that showing is the appeal procedure itself—and that is what the CBA's language expressly provides, and federal law contemplates. *See* 10 C.F.R. § 73.56(*l*) (requiring NRC licensees' appeal procedure to "contain a provision to ensure the individual is informed of the grounds for the denial or unfavorable termination and allow the individual an opportunity to provide additional relevant information and an opportunity for an objective review of the information upon which the denial or unfavorable termination of unescorted access or unescorted access authorization was based").

---

[7] Similarly, the seniority provisions of Article 12 provide that an "[e]mployee[] may lose [his] seniority standing" because of "[d]ischarge for just cause, not overturned by arbitration," as well because he "[i]s permanently denied unescorted site access for a security position" (and that "[i]t is understood that the employee has the right to appeal denial of site access in accordance with the requisite provisions of the Nuclear Regulatory Commission"). CBA art. 12, sec. 8. A proper syllogism based on this language is that a discharge for any reason *other than* loss of unescorted access may be arbitrated, but loss of unescorted access, tantamount to discharge, cannot be addressed through arbitration.

These observations also answer the Union's claim that the arbitration and exclusion clauses are ambiguous, and, thus, that the exclusion language should be read narrowly under the presumption of arbitrability. The language of a contract is ambiguous only "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Regents of Mercersburg Coll.*, 458 F.3d at 172 (citation omitted). In making this determination, again, "[c]ourts should not . . . distort the meaning of the language or strain to find an ambiguity," *id.*; *see also, e.g.*, *Local 827, Int'l Bhd. of Elec. Workers, AFL-CIO v. Verizon N.J., Inc.*, 458 F.3d 305, 312 (3d Cir. 2006) ("Insofar as the existence of contrary interpretations of the arbitration clause suggests that there may be a modicum of ambiguity in the language of the arbitration clause, we note that a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt." (citations and internal quotation marks omitted)); *cf. Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1197 n.4 (10th Cir. 2009) ("Excluding certain categories of disputes from arbitration is not alone dispositive of whether the clause is broad or narrow, but it is indicative of an agreement to limit arbitration to specific disputes."). But distortion, in fact, is what the Union urges when it contends that the Court should read the exclusion to exclude only issues that can be decided through the appeal procedure—such a reading would transform "issues involving" into "issues involved in," and the words would entirely lose their meaning. For the reasons explained above, and, when reading the CBA as a whole, the Court cannot discern just what other meaning the language of the arbitration and its exclusion could have, such that it might be ambiguous.[8]

---

[8] Other provisions of the CBA help to clarify what the parties were contemplating with the words "issues involving the decision to grant or deny unescorted access," and, whether viewed under the paradigm of interpreting the exclusion clause's unambiguous language or, in the alternative, providing forceful evidence of an intent to exclude certain disputes from arbitration, lead to the same result. For instance, the seniority provisions of Article 12 provide that an "[e]mployee[] may lose [his] seniority standing" if he "[i]s permanently denied unescorted site

13

For there to be any appreciable ambiguity, there would have to be some sort of daylight between ExGen's denial of access authorization and ENS's termination. But whether there is daylight, the Union seems to argue, is not a question this Court can answer, because "the question [of] what is left for the arbitrator to decide if the 'issues involving the decision to grant or deny unescorted access' are not reviewable . . . delves too deeply into the merits of the case." Union MSJ 8 (Docket No. 60).

This argument overlooks both (a) the irony of urging a court not to look at the "merits" when an arbitrator's own determination in such a case would *require* consideration of "issues involving the decision to grant or deny unescorted access," in contravention of the CBA's explicit command that such issues cannot be arbitrated, and (b) the fact that courts in fact *can* examine the merits to the extent that the merits are inextricably intertwined with the question of arbitrability, *see, e.g.*, *Rite Aid*, 595 F.3d at 136-37. For this same reason, the Union's suggestion that "the arbitrator can review ENS's actions resulting in [an employee's] being subjected to the access decision in the first place" is also untenable. Regardless of why an employee ended up losing his unescorted access, that he lost it, and that discharge was based in some way on that

---

access for a security position" and that "[i]t is understood that the employee has the right to appeal denial of site access in accordance with the requisite provisions of the Nuclear Regulatory Commission." CBA art. 12, sec. 8. The Union urges that this provision establishes that "there is no such thing as a discharge for denial of unescorted access and discharge for all other reasons, there is just discharge for cause," and discharges for cause must be arbitrated. Union MSJ 7. Of course, this reading of the contract ignores that *both* loss of seniority *and* termination of employment are probable consequences of—and undoubtedly "issues involving"—a permanent denial of site access. Moreover, this reading ignores the equivalency established by the provision: an employee may lose his seniority if permanently denied site access, and the way to challenge this decision is to *appeal denial of site access*. A proper syllogism based on Article 12, Section 8, is that an employee may lose seniority by "[d]ischarge for just cause, not overturned by arbitration" *as well as* for loss of site access, and these issues need to be listed separately because discharge for loss of site access cannot be "overturned by arbitration." The Union's syllogism has this backward. *Discharge* that is not overturned by arbitration (because normally it can be) may result in the loss of seniority, but so too may loss of unescorted access (which, the exclusion clause states, cannot be arbitrated).

14

loss of access (i.e., somehow "involv[ed]" the loss of access) brings the dispute within the exclusion clause and thus renders it unarbitrable. This atom cannot be split. "A court's purpose in examining a contract is to interpret the intent of the contracting parties, as they *objectively manifest it*." *Sanford Inv. Co., Inc. v. Ahlstrom Mach. Holdings, Inc.*, 198 F.3d 415, 421 (3d Cir. 1999) (emphasis added). And reading the CBA's language in conjunction with the arbitration and exclusion clauses (and their reference to "the access authorization program required by 10 C.F.R. Part 73"), leaves the objective reader with no doubt that a termination by ENS following a denial of access by ExGen is "an issue involving" the latter and therefore unarbitrable.[9]

Any suggestion that this state of affairs is somehow unfair is also unpersuasive: The question here, one must remember, is not whether review may be sought, but rather whether the parties agreed, as a matter of contract, to arbitrate this particular type of dispute. The CBA's language is unambiguous that they did not, and that, in essence, is the end of the matter.

*   *   *

Finally, the Union contends that Mr. Bastone's grievance raises issues that *do* fall within the arbitration clause—namely, violations "of his article 6, 13 and 14 rights under the current CBA" and "disparage [sic] treatment against a Union Official for protected, concerted activities," Grievance, and thus that this Court must send the dispute off to arbitration for the arbitrator to resolve.

Given that the Union has pleaded, as it conceded at oral argument, no factual content to substantiate these conclusory allegations (nor do the parties' Joint Statement of Undisputed Facts or any other submission by the Union suggest that there is any factual basis for these claims),

---

[9] None of this is to say that Mr. Bastone could not grieve some issue preceding the denial of his access authorization, but not involving it. But such an issue is not before the Court, as explained below.

sending this "dispute" off to arbitration is tantamount to the Court's abdicating its role to decide arbitrability by handing that very question off to the tribunal whose involvement depends on its answer. As the Third Circuit Court of Appeals has explained:

> In assessing whether a particular dispute falls within the scope of an arbitration clause, we "focus [ ] on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Medtronic AVE, Inc.* [*v. Advanced Cardiovascular Sys., Inc.*], 247 F.3d [44] 55 [(3d Cir. 2001)] (quotation marks omitted). In so doing, we "prevent[ ] a creative and artful pleader from drafting around an otherwise-applicable arbitration clause." *Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1198 (10th Cir. 2009).

*CardioNet*, 2014 WL 1778149, at *5 (alterations in original). The Tenth Circuit case quoted explains:

> While the[] authorities clearly require that we turn to the facts to determine which claims in a complaint must be arbitrated, they do not similarly insist that we do so in defining what claims the complaint alleges. To do otherwise, however, would undercut the policy of substance over form. Focusing on the facts rather than on a choice of legal labels prevents a creative and artful pleader from drafting around an otherwise-applicable arbitration clause. *See Combined Energies v. CCI, Inc.*, 514 F.3d 168, 172 (1st Cir. 2008) ("[The plaintiff] cannot avoid arbitration by dint of artful pleading alone."); *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 164 (4th Cir. 2004) (a party "may [not] use artful pleading to avoid arbitration"). This rationale applies with the same force to our initial discernment of a party's claims as to the application of an arbitration clause to each claim. By relying on the factual allegations to determine what claims are asserted in the complaint, we make explicit what has previously been implicit. *See Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1513 (10th Cir. 1995) (dividing allegations of a complaint into three categories according to their factual allegations before determining which were arbitrable); *see also Becker v. Davis*, 491 F.3d 1292, 1301 (11th Cir. 2007) ("While it would be much easier to do so, we will not send clearly non-arbitrable disputes to arbitration merely because a count, as pled, contains both arbitrable and non-arbitrable disputes.").

*Chelsea Family Pharmacy*, 567 F.3d at 1198.

There is no reason these same pleading requirements do not (or should not) apply to an arbitration exclusion clause. The Union cannot artfully—or inartfully, as the case may be—plead no factual content as to Mr. Bastone's Grievance and then tell the Court that it cannot ask "what

16

happened?" because to do so would be to "delve into the merits" when all the Court can decide is the question of arbitrability. The Court need not delve into the merits of the case to observe that no factual content has been pleaded (nor, now, at the summary judgment stage, evidence adduced) upon which it could assess whether Mr. Bastone was grieving something unrelated to—i.e., not involving—his denial-cum-termination. As ENS argues, such a hypothetical case of an ANSO's having been retaliated against in a manner not involving denial of his access authorization is not Mr. Bastone's case, however arbitrable such a claim may be. As laid out above, the Union filed Mr. Bastone's Grievance the same day that ExGen denied Mr. Bastone access authorization (March 8, 2010). Further, Mr. Bastone requested, as relief, to "be returned to work with all pay," etc. The point here is not that the Court should draw a factual inference that ENS must have terminated Mr. Bastone (and have done so subsequently) because of his denial of access—because that determination would concern the merits—but rather that Mr. Bastone grieved his termination before it occurred.

For one, this observation does suggest that Mr. Bastone and the Union knew for certain that termination by ENS was (and had) to follow, if forceful evidence of no ambiguity were required. *See supra* note 6. But more importantly, these underlying facts, to which the parties stipulated for the purpose of adjudicating their Motions, form the content that the Union should have pleaded from the outset. And if the Union had done so, what would have been clear in 2011 is that Mr. Bastone's access authorization was denied. His termination was an immediate and unarbitrable consequence. He could not have been "returned to work"—not, at least, without violating federal law.

To speculate about what might have been the case under other circumstances, or what Mr. Bastone or someone like him might be able to arbitrate, is not permitted. "Hypothetical

17

jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by [the Supreme] Court from the beginning." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998). And inasmuch as Mr. Bastone's Grievance presents such a hypothetical question about whether issues *not* involved (i.e., not pleaded) in this case should be sent to arbitration, the lack of a case or controversy would prevent the Court from adjudicating the case, for even the parties' "consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III." *CFTC v. Schor*, 478 U.S. 833, 851 (1986).

*   *   *

Termination based on the denial of unescorted access cannot be arbitrated. Otherwise, ENS—in the face of the CBA and the NRC regulations—would be forced to justify terminating an armed nuclear security guard who *cannot work as an armed nuclear security guard*. To read the CBA this way, as somehow ambiguous, would be to torture the very language the Court must interpret. Instead, because the Court does not find the contractual language ambiguous, the presumption of arbitrability does not apply. And the Union parties' suggestion that the exclusion clause cannot possibly be read to encompass such scenarios as where ENS falsifies information about the security guard to induce ExGen to terminate his access—leaving aside that that is not what allegedly happened here—is meritless, because the appeal procedure itself would be the contractually bargained-for means of addressing that issue.[10] Under ENS and Local 17's Collective Bargaining Agreement, Officer Bastone's grievance cannot be arbitrated, and summary judgment must be entered in favor of ENS.

---

[10] Again, the appeal procedure would be the forum for the security guard's asking the management why his access was denied, and then challenging that falsification when it came forward. To allow him to raise this challenge after he is terminated allows him to attack the access decision, and, *as the parties agree*, this he cannot do.

### III. CONCLUSION

For the foregoing reasons, the Court will grant ENS's Motion for Summary Judgment on ground that the CBA excludes this dispute from arbitration, deny as moot the Exelon parties' request for the same result based on the NRC's regulations, and, consequently, deny the Union's Motion.

An Order of Judgment consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge